4 and 5 and reversed as to the remaining claims.

Modified.

LENROOT, Judge, took no part in the consideration or decision of this case.

29 C.C.P.A. (Patents)

## In re WOOD et al.

### Patent Appeal No. 4617.

Court of Customs and Patent Appeals.

July 6, 1942.

Oberlin, Limbach & Day, of Cleveland, Ohio, for appellants.

W. W. Cochran, of Washington, D. C. (Clarence W. Moore, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

JACKSON, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office affirming that of the Primary Examiner rejecting all of the claims, 3, 4, 7, 9, 10 and 13 to 15, inclusive, of an application for a patent for alleged new and useful improvements in "Method of Heat-Treating Steel for Cold Draft Reduction and Product Thereof". Claims 3, 4, 7, 14 and 15 are product claims, and claims 9, 10 and 13 are method claims.

The references cited are: German Patent (Kronprinz), 123,728, September 27, 1901; Bain et al., 1,924,099, August 29, 1933.

The alleged invention relates to "heat treated carbon steel having physical qualities and structure such that it is superior to steels of the same analysis, [as] heat treated by old methods, when used for reduction by drawing, or for work demanding similar characteristics." The application relates particularly to the heat treatment of wire and the wire so treated.

In the claimed process the steel wire is heated by an electric current passing through a portion thereof between the electrical contact on the wire and a molten metal quenching bath contact. The temperature of the bath is of the order of 950° F. and quenches the heated wire to its own temperature. The wire is in continuous movement past the first contact and it reaches a maximum temperature of 1600° F. in 30 seconds just as it enters the quenching bath. The temperature of the wire is held at the quenching heat of the bath until the carbon transformation is substantially complete.

Claims 3 and 10 are illustrative and read as follows:

"3. As an article of manufacture, a wire, formed of carbon steel having chemical analysis and physical qualities within the limits useful for reduction by conventional drafting, said steel being characterized by a structure having a pattern which under magnification of 2000 diameters shows globular ultrafine carbides well dispersed in a matrix of combined ferrite, without discernible lamellar pearlite and with substantially no proeutectoid ferrite.

"10. A method of heat treating carbon steel wire having an analysis such as is conventionally reduced by drafting; comprising the steps of advancing such wire at constant speed longitudinally into and through a quenching bath of electrically conductive liquid maintained substantially at a temperature of the order of 510° Centigrade; heating the steel of such wire as it enters such bath to its critical temperature in less than 60 seconds by supplying a heating current of electricity thereto

between the liquid of such quench bath and an electrode in spaced relation therewith; and holding such wire within such quench bath until carbon transformation is substantially complete."

The German patent relates to a "Process for hardening steel wires, steel bands, and the like." The process is described as follows: "The new process consists in leading the wire over a roller a, which is in connection with one pole of a source of electricity. The second pole is connected with the lead bath b, in such a way, that the part of the material to be hardened between the roller a and the lead bath b is traversed by the current and thus heated. In this way the wire is continuously brought to uniform red heat between the roller a and the lead bath and in this condition arrives in the lead bath, from which it is removed in the usual manner. Instead of the rollers, connected with the poles of the source of electricity, slide contacts can also be used, over which the material to be hardened is led."

The drawing of the patent shows electrical contacts at the roller and the lead bath in which the heated wire is quenched. No specific temperatures are disclosed.

The Bain et al. patent relates to the thermal hardening of carbon and alloy steels. The patent discloses a process whereby the wire to be hardened unrolls from a reel into a furnace in which there is a resistance coil through which the wire is continuously passed and becomes heated to the desired temperature. The heated wire then passes into a quenching bath which is spaced away from the furnace. The following statements appear in the patent: "When a carbon or alloy steel mass is quenched from a temperature above its transformation temperature range, at which temperature the steel is in the so-called austenitic form, to a temperature below this range, the rate of conversion of the austenite to pearlite, sorbite, troostite or martensite crystal structures which are formed at the lower temperature varies markedly. In general it may be said that there are two zones of rapid austenite conversion. With carbon or low alloy steels one conversion zone lies at a temperature approximating 1200° F. to 900° F. at which the relatively soft pearlite structure is formed. The second zone lies in the temperature range approximating 300° F. or below, wherein rapid conversion of austenite to martensite is obtained."

The Primary Examiner in rejecting product claims 3, 4, 7, 14 and 15 held that the Bain et al. patent discloses substantially the same process as that involved herein and then stated "it follows that, if the desired properties recited in these claims are possessed by applicants' product, they necessarily are possessed also by the product of the process of Bain."

Method claims 9, 10 and 13 were rejected by the Primary Examiner as lacking invention over the Bain et al. patent, particularly in view of the German patent. With respect to these claims the examiner in his statement said as follows:

"Bain, see Fig. 1, discloses treating steel wire to produce a wire of high strength and high ductility (and thus adapted to reduction by drafting) by electrically heating it to a temperature above the critical from which it is quenched in a molten metal bath which may, (according to one example referred to in lines 138 to 140 on page 2 and in lines 6 to 9 on page 3), be at a temperature of 1000° F. (538° C.), which indisputably is 'a temperature of the order of 510° C.' as recited in the most specific of applicants' claims. [Applicants argue in lines 11 and 12 of page 3 of amendment filed April 18, 1940 as follows:

" 'Bain worked in temperature zones of quench below those used by applicants therein.'

"This statement, like some others applicants have made, is correct as far as it goes, but if—as appears from the context— it is intended to suggest that Bain did not also work in the same temperature zones of quench as those used by applicants, it is, to that extent, misleading, as evidenced by the above cited disclosure of 1000° F. (538° C.) in Bain].

"It is considered that it would be obvious to use the apparatus of 'Kronprinz' in practicing the patenting process which is disclosed by Bain. Kronprinz is hardening steel wire by passing current through a portion thereof defined by an initial contact and a molten lead bath which serves also to quench the wire (the same apparatus being used as applicants use as applicants have tacitly admitted)." (Brackets quoted.)

Claim 14 was further rejected by the Primary Examiner as failing to properly point out the alleged invention, in that it "relies for its definition of the article upon an alleged comparison with 'conventional

patenting", which latter is obviously an indefinite quantity." In view of our conclusion it is not necessary to consider that further ground of rejection.

The Board of Appeals affirmed all of the reasons for rejection of the claims given by the examiner. Subsequent to the board's decision, appellants filed a petition for reconsideration, in which appears the following statement:

"The Board failed to note the affidavit of a competent metallurgist, filed during prosecution before the Examiner, which affidavit controverts conclusions, which have been drawn from the explanatory statements made in the Bain patent.

"This metallurgist, J. W. Morrison, by reference to data in his published paper in Iron & Steel Engineer (Pittsburgh), establishes the improvement in physical qualities which result, when appellants' method is followed instead of the method of conventional patenting, when preparing wire for reduction by drafting. Also he states that instead of the lamellar pearlite structure which is characteristic of steel wire when conventionally patented, there is found in the product of appellants' process 'very fine particles, or globules, of carbide well dispersed, with no lamellar pearlite discernible at magnifications of 2000'. Further this metallurgist states that 'The change in constituents resulting from the new method of Messrs. Wood and Trautman, results from the heating by electrical resistance and from the quench at maximum temperatures.'"

The board in its decision on the petition stated as follows:

"Our decision does not appear to conflict with the statements of fact quoted by petitioners from the affidavit that the change in constituents results from heating by electrical resistance, etc., but it does point out that the German patent discloses it is old to apply an electric current to wire prior to its entrance to a quenching bath and it was considered that to substitute this method of heating for another method of electric heating in the Bain et al. process would not amount to patentable improvement. It seems to be true that affiant Morrison stated he had never heard of any use of resistance heating in the industry of heat treating wire, but apparently he did not know of the German patent or at least did not take it into consideration. In applying references the examiner proceeds in view of the art before him regardless of what knowledge experts may not have about the art and he concluded rightly, we think, that in view of the German patent disclosure there was no invention over the Bain et al. patent.

"For the reasons given in our decision and herein, the rejection is affirmed."

In the application appear two reproductions of greatly enlarged photographs of cross-sections of similar steel, one prepared in accordance with the teachings of appellants and the other prepared according to the conventional or "patented" method. In the former cross-section there is said to be no "pearlite" observable, and we assume this to be the fact, while in the latter "pearlite" and "free ferrite" are said to be clearly shown, which we also assume to be the fact.

The wire of the former cross-section was heated by means of the electric current passing through it and the quenching was done directly in the bath without any exposure of the wire to air, while the wire of the latter cross-section was exposed to the air between the furnace and the bath.

It seems clear that the better result accomplished by the process of appellants would be reached by the process of the Bain et al. patent if his apparatus were arranged so that there would be no exposure of the heated wire to the air and that the wire when heated to the desired temperature was abruptly quenched. This change, if it might be considered a change, in the Bain et al. structure, certainly would not require more than mechanical skill. It would merely consist in moving the bath to the furnace.

As far as the method of heating the wire by passing an electrical current through it is concerned, this is definitely disclosed by the German patent. Therefore, even if that patent is approximately forty years old and even though no one in the art prior to appellants had used the method shown in that patent, it certainly was before them and is a clear anticipation of that form of heating wire.

We are of opinion that the claims were properly rejected, and therefore the decision of the Board of Appeals is affirmed.

Affirmed.

LENROOT, Associate Judge, took no part in the consideration or decision of this case.